UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION

| | |
|---|---|
| **UNITED STATES OF AMERICA,** | **CASE NOS. CR 1 04-77** |
| **PLAINTIFF** | **CR 1 05-74** |
| | **CR 1 05-86** |
| VS. | |
| **JOHN TODD KILLINGER,** | (DLOTT,J.) |
| **STEVEN MINGER,** | (HOGAN, M.J.) |
| **RONALD TRESTER,** | |
| **DEFENDANTS** | |

## REPORT AND RECOMMENDATION

This Court conducted a hearing on the morning of December 1, 2005. The first order of business was to put of record the various restitution agreements which were struck between counsel for Trust Corp and various Defendants. Those agreements are summarized below:

1. Trust Corp and Defendant Roberson agree that the appropriate restitution amount is $616,296.02 for all properties except 1120 Eddy Street. Both Trust Corp. and Roberson envision the Court use that number as a starting point for its eventual restitution order.

2. Trust Corp. withdraws it request for restitution with respect to Defendants Minger, Killinger and Bold because of out-of-court settlements. Defendants Minger and Killinger have also struck agreements with Price Hill Will.

3. Trust Corp and Defendant Jasper agree that the appropriate amount of restitution relative to 103 Winfield is $55,264 and have reached an out-of-court settlement to that end.

4. Trust Corp and Defendant Powers have reached an out-of -court settlement and agree that the appropriate amount of restitution is $500,000, payable as follows: $12,000 per year for 30 years and a final balloon payment of $140,000. $2500 to be paid on 12/31/05 and $2500 to be paid on 1/31/06 and both amounts to be credited to the $500,000 debt. Security for the debt to

be provided by Defendant Powers and to be satisfactory to Trust Corp.

## DEFENDANTS REQUEST FOR A CONTINUANCE

The Court then entertained a joint defense request for a continuance in order to prepare for the cross-examination of expert witnesses Geoff Smith and Elizabeth Blume. After hearing the direct testimony of both witnesses and viewing the 3 volumes of exhibits, the Court overruled Legal Aid's objections to a continuance and ordered the two witnesses, retained by Legal Aid, to appear for cross-examination on December 8, 2005. Although defense counsel (James Perry, Paul Laufman and Patrick Hanley) may have been somewhat informed by Legal Aid and had possession of the expert reports in advance of the hearing, the Court accepted their professional representation that they were not able to thoroughly prepare for cross-examination of these expert witnesses within the time parameters set by the Court. Because the theory of community-based restitution is a novel one, because these are criminal cases and because this Court has never engaged in a somewhat cooperative effort with the district judge in fashioning a sentence, the Court simply took the safe path and granted the continuance, although the Court saw no need to continue either expert's direct testimony in the interest of time. When the hearing resumed one week later, all named Defendants had struck restitution agreements with both Trust Corp. and Price Hill Will, with the sole exception of Defendant Trester, who declined to cross-examine either expert.

## REPRESENTATIVE DRIEHAUS

Steve Driehaus is an elected state representative, whose district encompasses the Cincinnati neighborhood of Price Hill, where Representative Driehaus currently resides. Mr. Driehaus in his testimony and in a letter, placed of record by the Court on December 1st at the hearing, explained that he is a proponent of community-based restitution and is in favor of the Court's creation of a fund to be administered by the Greater Cincinnati Foundation, which has agreed to administer such a fund. Cross-examination of Mr. Driehaus predictably centered

around factors other than "predatory housing investment schemes" which may have acted to lower property values in Price Hill, such as an increase in Section 8 housing and an increased crime rate.  The Court, of course, permitted cross-examination of Mr. Driehaus, but did not agree to order him to return so that Defendants could better prepare, although he, in fact, did return.  The gist of Mr. Driehaus' testimony is that "mortgage flipping" has a negative effect upon property values as does other things.  Mr. Driehaus then proposed a plan to address the problem, with which Defendants were free to agree, disagree or propose alternatives.  The argument against the Driehaus plan and community-based restitution in general came from Defendant Trester's counsel that the community is not an identifiable victim and even if it was, the number is so large as to make community restitution impractical.  The Court agrees with counsel's second point.  The Court saw no need to prolong the hearing by continuing the matter for more intensive cross-examination of Mr. Driehaus.  That "mortgage flipping" has a negative effect upon property values is self-evident.

There are, however, legitimate questions that should have been and were addressed, such as when the loss occurs, whether one can sustain a loss in the absence of knowledge about it, and the uneven amount of the loss sustained within the neighborhood as one goes further and further away from the subject property.  Where to draw the line relative to the latter point may be open to debate.  The looming questions are who is a victim, how and when to quantify the loss and how to manage community-based restitution in such a way as to be fair both to victims and the victimizers.

### GEOFF SMITH AND "THERE GOES THE NEIGHBORHOOD"

Geoff Smith works as a project director for a Chicago-based "think tank" called Woodstock Institute.  Mr. Smith is an applied researcher with a masters degree in geography and who is pursuing another graduate degree in real estate/economics.  In June, 2005, Mr. Smith co-authored, along with a regional planner from the Georgia Institute of Technology, a research study called "There Goes The Neighborhood: The Effect of Single-Family Mortgage Foreclosures on Property Values."  Using a statistical technique called hedonic price regression, Smith and Immergluck, his co-author, were able to measure the price diminution in neighborhoods caused by mortgage foreclosures within 1/8  mile of the subject property and

between 1/8 and 1/4 mile of the subject property. The study was limited to the City of Chicago and between the years 1997 and 1999. The sample size was 9,600 single family property transactions in 1999. Results of the study indicate that each foreclosure within 1/8 mile of neighboring properties caused a 0.9% average decline in value and that when low-moderate income neighborhoods (defined as 80% of median wage) are considered, the loss in value was an average of 1.44%. Results of the study for the area beyond 1/8 mile were statistically insignificant. The study featured controls for 40 variables, such as the age of the residence, the number of bedrooms, presence of central air conditioning, etc (See Table 3 on Pg. 10) and used data supplied by public bodies, Illinois Dept. of Revenue, Cook County Assessor's Office, court records of foreclosures as supplied by the Foreclosure Report of Chicago. Outside influences, such as the effect of the crime rate and the presence of Section 8 housing were not controlled.

### ELIZABETH BLUME AND LINKING THE WOODSTOCK STUDY TO PRICE HILL

Elizabeth Blume, A.I.C.P., holds a masters degree in community planning from the University of Cincinnati and is currently the Associate Director of the Community Planning Institute at Xavier University. Her task was to implement the findings of Smith and Immergluck and to quantify the loss to the Price Hill and other communities. Ms. Blume first identified all the single-family homes within 1/4 mile of 11 properties known to have been "flipped." The next step was to quantify the loss using the percentages (0.9% and 1.4%) generated by Smith and Immergluck in order to determine the loss per neighborhood. The results showed a loss of $63,168, using the 0.9% figure and $101,314, using the 1.4% figure. Property values were based on data obtained from the Hamilton County Auditor. Only 3 of the 11 properties used to generate the loss per neighborhood were located within the suburb of Price Hill.

The loss attributed to Defendant Killinger, responsible for "flipping" 13 properties was $821,184 (0.9%) or $1,317.433 (1.4%). The loss attributed to Defendant Minger, responsible for "flipping" 9 properties was $568,512 (9%) or $912,069 (1.4%). The loss attributed to Defendant Trester, responsible for "flipping" 11 properties was $694,848 (9%) or $1,114,751 (1.4%).

### COMMUNITY RESTITUTION AND THE MANDATORY RESTITUTION ACT

18 U.S.C., Section 3663 states in pertinent part that: The Court, when sentencing a defendant convicted of an offense against property under this title, including any offense committed by fraud or deceit, must order . . . that the defendant make restitution to any victim of such offense. . .  The term "victim" is defined as "the person directly and proximately harmed as a result of the commission on an offense for which restitution may be ordered including, in the case of an offense that involves as an element a scheme, conspiracy or pattern of criminal activity, any person directly harmed by the defendant's criminal conduct in the course of  the scheme, conspiracy or pattern."  Where there is no identifiable "victim," the court may still order restitution for offenses committed under the Controlled Substances Act, but that restitution must be based on "the amount of public harm caused by the offense," as determined by the court in accordance with United States Sentencing Commission, cannot exceed the amount of the fine ordered for the offense charged in the case, and must be distributed on a 65% - 35% basis to state agencies designated to administer crime victim assistance and to receive federal substance abuse block grant funds.  One might argue that if Congress intended community based restitution to apply to "flipping" cases, it would not have limited awards to state and federal agencies, but rather would have included community groups as possible recipients. In any event, Price Hill Will, represented by The Legal Aid Society, urges the Court to define the Price Hill community as a legitimate "victim" which was directly and proximately harmed as a result of the crimes committed by the three named Defendants.  We do not agree that the community of Price Hill is properly classified as a "victim."

An injury or damage is proximately caused by an act or failure to act, whenever it appears from the evidence in the case that the act or omission played a substantial part in bringing about or actually causing the injury or damage, and that the injury or damage was either a direct result or a reasonably probable consequence of the act or omission.  See Federal Jury Practice and Instructions by Devitt, Blackmar and Wolff, West Publishing Co., 1987, Section 80.18.)  This Court concludes therefore that Defendants' acts both played a substantial part in causing the damage to the community and that said damage was  a reasonably probable consequence of the act of "flipping," and a direct result of same.   Proximate causation does not appear to be a serious obstacle for Price Hill Will, nor does a defense argument that the loss sustained by the community is remotely caused have much credence.  We believe the thrust of the expert testimony from Smith and Blume was designed to counter the defense argument that

the damages sustained by the community were speculative. Juries are routinely told not to award speculative damages, but rather to consider only damages reasonably certain to occur. (See Federal Jury Practice and Instructions, Section 85.14). We believe that damages to a surrounding community are reasonably certain to occur as a reasonable and predictable consequence of the practice known as "flipping" and that these losses are quantifiable.

## THE HIERARCHY OF VICTIMS IF ALL QUALIFY

In the typical "flipping" case, the innocent purchaser, who buys the property at an inflated price, is the victim most directly affected. However, the purchaser's loss may be only on paper; the loss may not realized until the property is sold. If the purchaser pays off the mortgage, the lender remains unaffected, but when a default occurs, the lender, unable to sell the property at the inflated value, sustains a loss when it sells the property at real value. When there is a sale following a mortgage forfeiture, both the innocent purchaser and the lender sustain real losses. Thus, it seems prudent to consider the innocent purchaser and the lender, in that order, as the most affected persons and entitled to priority status when restitution to victims is considered as an objective to be obtained in a criminal sentencing. Although either entity could have prevented the loss by a more careful consideration of market value, the innocent purchaser would likely be the entity least able to sustain a loss because the lender has the advantage of offsetting losses in one market with gains in another. One in the business of making mortgage loans should have more experience in determining true value than purchasers, not all of whom are sophisticated. It is fair to say that none of the purchasers in this case were of the sophisticated variety. It is also fair to say that although innocent victims should be restored by the criminal justice system, the situation is quite different when those who appear innocent are, in fact, not. Those who falsify HUD forms and otherwise accept "kickbacks" in the form of down payments not paid by those purchasers do not qualify as victims. The purchasers in this case cannot claim innocence.              It is our opinion that community-based restitution should only be considered when the individual defendant's personal financial condition is sufficient to enable that defendant to first make restitution to the innocent purchasers and the lenders, in that order, if, in fact these persons apply. If there is a reserve of funds that could be directed to restore a community, this Court sees no theoretical reason not to direct such

restitution toward restoration of that community as long as the opposing argument is grounded in considerations of lack of causation and speculative damages. However, we have real concerns that this theoretical plan can be lawfully or practically accomplished.

That there is a practical problem with such a plan as was brought out in *United States v. Jolivette*, 257 F.3d 581 (6th Cir. 2000). Jolivette was sentenced to, among other things, make restitution in an undisclosed amount pending receipt of a report from a probation officer. 18 U.S.C., Section 3664(d)(1)(5) requires the sentencing court to determine the loss to the victim within 90 days of rendering sentence and that was not done in the *Jolivette* case. The victims were identified, but the amount of restitution owed was undetermined. The Sixth Circuit held that after 90 days the judgment contains no enforceable restitution provision. In accord is *United States v. Shoucair*, 112 Fed.Appx. 447 (6th Cir. 2004) and *United States v. Vandeberg*, 201 F.3d 805 (6th Cir. 2000).

Another case of interest is *United States v. Grimes*, 173 F.3d 634 (7th Cir. 1999), a case in which at time of sentencing, the identity of the victims had not been ascertained although an amount of restitution had been awarded. The Circuit vacated the order of restitution and remanded the case with directions to give the victims the benefit of the 90 day period and to limit the restitution order to those victims identified within the 90-day period.

We also know that trial courts must consider the financial resources of the Defendant in ordering restitution. *United States v. Durham*, 755 F.2d 511 (6th Cir. 1985) and *United States v. Padgett*, 892 F.2d 445 (1989). When other more directly harmed persons are addressed, it is unlikely than any sizeable amount will be available for restitution to a community. In addition, it makes little sense to make awards to more remotely harmed entities as the expense of those sustaining more direct losses.

If the community is a "victim" as the term is used in 18 U.S.C., Section 3663, it would seem that the expert testimony in this case would enable the court to conclude that the "victims" were both identified as those within 1/8 of a mile of the foreclosed upon property and their loss quantified by Ms. Blume. However, it seems equally obvious that those "victims" owning property furthest away from the subject property sustained lesser losses than those next door. The Woodstock/Blume study for statistical purposes, used an average loss as the basis for calculating the community damage caused by each Defendant, and its proponents ask the Court to assume that a limited fund of money can be fairly distributed to those owners within 1/8 of a

mile and that a private entity should determine how that limited fund can be equitably allocated to hundreds of homeowners within that 1/8 mile radius.  Such a proposal is not, in this Court's opinion, consistent with either precedent or legislative intent.

## THE COMMUNITY AS A VICTIM AND OPINION

The legislative history of 18 U.S.C., Section 3663 would indicate that a "victim" must be identifiable and that the term be limited to one who sustains a loss as a direct result of the offense or  offenses for which a defendant has been convicted.  If the "victim's" loss is not clearly casually linked to the offense for which the defendant was convicted, or is speculative, the mandatory restitution provided by 18 U.S.C., Section 3663 should not apply.  Highly complex issues related to the cause or amount of a "victim's" loss should not be resolved under the statute.  The law anticipates that the probation officer will assemble, as part of the pre-sentence investigation process, information sufficient for the court to enter a restitution order.  A full-scale evidentiary hearing, such as we conducted in this case, is seen to be "contrary to the interests of the swift administration of justice."

Making an award of restitution to "victims" outside the above parameters was thought to be analogous to awarding restitution to the "victims" of offenses for which the defendant was not convicted unless, of course, defendant agreed to do so in a plea bargain.

Although we believe the community to be an identifiable "victim" in this case and its losses to be proximately caused, proof of the community's loss is without a doubt complex and beyond the capacity of an average probation officer to assimilate within the applicable 90-day time frame.  Our concerns, however, go beyond the legislative history and are impacted by a number of reported decisions of other courts, one of the most significant of which is *United States v. Johnson*, 2005 WL 3179893 in which the Defendant was convicted of RICO violations and conspiracy offenses.  Basically, the modus operandi was to purposely burn houses and collect insurance proceeds. The trial court ordered restitution to three insurance companies and one individual.  The trial court found that Johnson was actively involved in all four predicate acts (one murder, two acts of arson and one mail fraud) but Johnson was convicted of only two, although the jury did not specify which two, and thus Johnson argued that he should pay restitution only in relation to the predicate acts for which he was convicted.  Although the Circuit

reversed on another basis, the restitution award to "any victim harmed by the defendant's criminal conduct" was approved. The significance to Defendant Trester is that he was convicted of bank fraud and conspiracy to commit bank fraud, much more restrictive charges than those faced by Johnson. Secondly, the charges of bank fraud and conspiracy to commit bank fraud contemplate that the bank be the sole victim. See 18 U.S.C., Sections 371 and 1344.

Another case of interest is *United States v. Jones*, 77 F.3d 66 (3rd Cir. 1966). In the *Jones* case, the Defendant, a medical doctor, submitted false insurance claims for nonexistent services and was indicted for mail fraud. One of Jones' patients sought restitution for his making her drug dependent on the theory that such dependency was a part of Defendant's scheme to defraud insurance companies. Although the trial court granted restitution to the insurance companies, it denied restitution to the patient and held that the patient, Harris, was not a "victim" within the meaning of 18 U.S.C., Section 3663. The Circuit agreed with this comment:

> Section 3663(a)(2) is not so broad that it permits a district court to order restitution to anyone harmed by any activity of the defendant related to the scheme, conspiracy, or pattern. Rather, in order for restitution to be permissible, the harm must "directly" result from the "criminal conduct" of the defendant. In this context, we interpret "direct" to require that the harm to the victim be closely related to the scheme, rather than tangentially linked. Further, we interpret "defendant's criminal conduct" in the course of the scheme, conspiracy or pattern to mean conduct that is both engaged in the furtherance of the scheme, conspiracy or pattern, and proscribed by the criminal statute the defendant was convicted of violating.

Another case of interest is *United States v. Donaby*, 349 F.3d 1046 (7th Cir. 2003). Here Donaby was indicted for bank robbery and a weapons offense. A police car was damaged during pursuit of Donaby, and a "getaway" car, stolen prior to the robbery was also damaged during pursuit. The trial court awarded restitution to both the owner of the "getaway" car, and the police department. The Circuit affirmed, holding that the police department met the definition of "victim" as the term is defined in the Mandatory Victims Restitution Act because the "damage was caused by the specific conduct that was the basis of the defendant's bank robbery conviction. On the one hand, this case liberally interprets the term "victim." On the other, it dealt with a loss which was simply calculated and within the probation departments

ability to assess within time limits.

In *United States v. Pawlinski*, 374 F.3d 536 (7th Cir. 2004), defendant was convicted of mail fraud for using campaign contributions for personal use and for accepting corporate contributions. Restitution owed was established, but few contributors applied for an award. The trial court ordered the balance paid to a crime victims fund and defendant appealed. The Circuit reversed the restitution award to the fund and held that the fund was neither a "victim" nor a representative of a "victim" within the MVRA.

Lastly, there are two cases from the Ninth Circuit which dealt with the concept of community restitution. The first is *Blue Mountain Bottling v. United States*, 929 F.2d 526 (1991), a price-fixing case wherein the court ordered restitution to a fund established by the court and distributed to local substance abuse organizations. Although there was a corporate defendant and restitution was awarded pursuant to the Federal Probation Act and not the MVRA, the reasons why the Circuit disapproved the restitution award are instructive. First, the Circuit pointed out that the organizations that would receive the funds were not "specifically aggrieved by defendant's actions." Second, the price-fixing crime and the substance abuse programs are not related. Third, the money awarded is not a loss caused by the offense for which defendant was convicted. Fourth, there are no standards to determine how district courts should decide which individuals or organizations should receive the funds.

The Ninth Circuit also reversed an award of community restitution to charitable organizations in *United States v. Redding Construction Co. Inc*., 967 F.2d 595 (1992). The Circuit said that assuming that minority businesses were harmed by the corporate defendant, making an award to the minority community is too broad. In other words, the minority community is not a "victim" within 18 U.S.C. Section 3563, admittedly not the MVRA, but nonetheless instructive.

In our opinion, precedent does not support a broad definition of "victim" and does not approve of either protracted evidentiary procedures to determine the existence of "victims," nor does it approve of community groups dolling out restitution awards in the absence of standards. In this Court's opinion, the lawyers advancing the argument in favor of community-based restitution have no conflict of interest in supporting same because the recipient group would be responsible for deciding who gets what. On the other hand, whatever group is charged with the distribution of limited funds has a systemic problem of making choices which benefit some and

do not benefit others.  This makes such a system unmanageable and unduly complicated.  Although direct causation may be found to exist between the defendant's misbehavior and the consequences to a community in the sense that no intervening causes break the chain of causation, one can see that limits must be placed and this Court's opinion is that the direct causation refers to the direct vs. tangential dichotomy.  As succinctly stated in the *Jones* case, direct causation means that the harm to the "victim" must be closely, rather than tangentially linked to the scheme.  The relationship here between the criminal act and the entity claiming to be a "victim" is simply not close enough.   To so hold is consistent with the public policy in favor of the swift and efficient administration of justice.

## CONCLUSION

As a result of settlement negotiations between Defendants Killinger and Minger, respectively and Trust Corp., and these two Defendants and Price Hill Will, an amount of restitution owed Trust Corp. and Price Hill Will, the only "victims" to have applied as such in respect to these two Defendants,  out of court settlements have been reached.  There are no applications filed with respect to Defendant Trester, save that of Price Hill Will, and the report of the pre-sentence investigation in regard to Defendant Trester indicates both a present inability to pay restitution as well as a likely future inability to pay restitution.  Although there is a possibility that recent transfers of real estate to relatives could be set aside by court order, it is not realistic to think that a court could act within a 90-day period.  There are no homeowners claiming restitution owed, nor are there any mortgage lenders other than Trust Corp. who have sought restitution.

In an appropriate case, restitution could be awarded and directed to the rehabilitation of the subject properties themselves.  Supervision in such a case can be direct supervision by the Probation Department, rather than delegation to a private entity, such as The Greater Cincinnati Foundation and the indirect supervision that such an approach entails.

In summary, we believe that community-based restitution, as described by the two expert witnesses who testified in this case, cannot be legitimately attacked on the basis that the damages sustained by the community are other than proximately caused or are speculative and that such damages cannot be quantified.  We, however, believe that a community  should not be considered a "victim" as that term is used in the Mandatory Restitution Act.  We believe that in the hierarchy

of victims (assuming those victims come forward and apply for restitution) to be made whole by an individual defendant, that the innocent purchaser be considered first, the lender next, and in the event that the individual defendant has the assets or earning potential to make further restitution to the community, that such an award be directed toward the rehabilitation of the "flipped" property itself and that the Probation Department, rather than a private entity, monitor the situation.  If the "flipped" property is restored, so will the community be restored.  There is no need for the delegation of judicial decision-making to community groups like Price Hill Will.  There is also no present proof that any property owner whose property is outside of an 1/8 mile radius has sustained any quantifiable loss.  Therefore, such a remote property owner cannot be considered a "victim."

One cannot be considered a "victim," regardless of geographic proximity, unless one applies for restitution and in reference to these three Defendants, no homeowners applied and Trust Corp. negotiated out-of-court settlements with all Defendants save Defendant Trester, whom the record shows to have no ability to pay restitution.  Thus, this Court recommends in respect to Defendant Trester that no restitution award be made to Price Hill Will.


December 14, 2005                           s/Timothy S. Hogan
                                            Timothy S. Hogan
                                            United States Magistrate Judge

# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF OHIO
## WESTERN DIVISION

**UNITED STATES OF AMERICA,**
    **Plaintiff(s),**

                                            **CASE NO. 1:04cr077**
                                                                 **1:05cr074**
                                                                 **1:05cr086**
    **v.**                                                       **(Dlott, J.; Hogan, M.J.)**

**JOHN TODD KILLINGER,**
**STEVEN MINGER,**
**RONALD TRESTER,**
    **Defendant(s).**

## NOTICE

    Attached hereto is the Report and Recommended decision of the Honorable Timothy S. Hogan, United States Magistrate Judge, which was filed on 12/14/2005. Any party may object to the Magistrate's findings, recommendations, and report within (10) days after being served with a copy thereof or further appeal is waived. *See United States v. Walters*, 638 F.2d 947 (6th Cir. 1981). Such parties shall file with the Clerk of Court, and serve on all Parties, the Judge, and the Magistrate, a written Motion to Review which shall specifically identify the portions of the proposed findings, recommendations, or report to which objection is made along with a memorandum of law setting forth the basis for such objection, (such parties shall file with the Clerk a transcript of the specific portions of any evidentiary proceedings to which an objection is made).

    In the event a party files a Motion to Review the Magistrate's Findings, Recommendations and Report, all other parties shall respond to said Motion to Review within ten (10) days after being served a copy thereof.